# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

UNITED STATES OF AMERICA

versus

JOHN EMERSON TUMA &
CODY MONTGOMERY TUMA

CRIMINAL NO. 11-0031-01
JUDGE TOM STAGG

## MEMORANDUM RULING

Before the court is a motion for new trial filed by John Tuma.[1] See Record Document 126. For the reasons set forth below, the defendant's motion for a new trial is **DENIED**.

## I. INTRODUCTION

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[M]otions for new trial are not favored, and are only granted with great caution." United States v. O'Keefe, 128 F.3d 885, 898 (5th Cir. 1997) (quoting United States v. Hamilton, 559 F.2d 1370, 1373 (5th Cir. 1977)). The

---

[1] Originally, John Tuma was charged in a five count indictment along with his son, Cody Tuma. See Record Document 1. Prior to trial, Cody Tuma pled guilty to a lesser charge in a bill of information. See Record Document 79.

remedy of a new trial is warranted "only where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict." O'Keefe, 128 F.3d at 898 (citations and internal quotations omitted). John Tuma bases his motion for new trial on three grounds: 1) the court limited the introduction of evidence regarding a child custody case that was intended to show bias on the part of Cody Tuma; 2) the court excluded evidence regarding environmental harm or the lack thereof to the Red River; and 3) the government made improper comments during its closing argument. The court has considered all of the defendant's arguments and finds that a new trial is not warranted.[2]

## II. ANALYSIS

**A.     Cody Tuma's Child Custody Controversy.**

At trial, the defense intended to attack Cody Tuma's credibility by showing that he had a bias and motive to testify falsely against his father. This bias, the defense argues, arose out of a child custody case involving Cody Tuma's son from his first marriage. The defense planned to demonstrate that Cody Tuma made a deal with the government to testify against his father, John Tuma, because John Tuma refused to support his son in a child custody battle with Cody Tuma's ex-wife, Kristen. The defense planned to accomplish this through the testimony of Kristen and Cody

---

[2] The court also finds that a hearing is not necessary to rule on the matter.

Tuma's current wife, Carli, as well as through the direct-examination of John Tuma and the cross-examination of Cody Tuma.

During trial, the court struck Kristen and Carli from the defense's witness list but allowed defense counsel to examine John and Cody Tuma on the matter, although, those examinations were limited. John Tuma argues that the court erred in excluding these two witnesses and limiting both the defense's examinations of John Tuma and Cody Tuma regarding the child custody controversy. Specifically, the defense sought to inquire about the contents and authors of several letters in support of the custody order. The defense cites the importance of safeguarding the defendant's right to cross-examination and claims that the court's ruling effectively prejudiced John Tuma's ability to fully inform the jury of Cody Tuma's bias.

"While the Sixth Amendment guarantees the right of a defendant to cross-examine witnesses against him, that right is not unlimited." United States v. Bernegger, 661 F.3d 232, 238 (5th Cir. 2011) (quoting United States v. Jimenez, 464 F.3d 555, 558 (5th Cir. 2006)). The trial court has wide latitude to impose reasonable limits on cross-examination regarding a witness's bias and motivation to testify based on concerns of harassment, prejudice, confusion of the issues, or interrogation that is repetitive and only marginally relevant. See Bernegger, 661 F.3d at 238. What is required is to allow the defense to expose facts so the jury can appropriately draw

inferences relating to witness reliability. See id. To determine if a Sixth Amendment violation has occurred, the court inquires into "whether the jury had sufficient information to appraise the bias and motives of the witness." Id. (quoting United States v. Tansley, 986 F.2d 880, 886 (5th Cir. 1993)).

The court has reviewed the record and does not find that John Tuma's Sixth Amendment rights were violated. The court allowed defense counsel to examine witnesses extensively on the matter and only limited the defense from going into specific details that would have been prejudicial. The defense was still able to elicit testimony from both Cody Tuma and John Tuma that: 1) the custody controversy existed; 2) Cody Tuma requested support from his father; 3) his father refused; and 4) Cody Tuma made a deal with the government to testify against his father, thereafter. The jury had sufficient information to appraise the bias and motives of Cody Tuma.[3]

---

[3] At trial, the jury was able to hear both sides of the story to appraise Cody Tuma's bias. Regarding Cody Tuma's version of a breakfast meeting between him and his father, Cody Tuma testified to the following on cross-examination: "I started off the conversation just asking him, you know, if he ever wanted to do the right thing. And I thought we should do the right thing and tell the truth. And he informed me we had been going on too long for this, were in too deep. And so I asked him to protect me. I expected him to protect me in this; I didn't want to participate anymore." Record Document 123, Testimony of Cody Tuma at 74.

## B. Environmental Harm.

The defense claims that the court erred in excluding testimony regarding environmental impact on the Red River. It argues that while evidence of environmental harm is not relevant to the elements of the crime charged[4], it is relevant to the credibility of the prosecution's witnesses: Cody Tuma; Wayne Mallet; and Todd Cage. During trial, the defense proffered that Charles Tubbs ("Tubbs") would testify that if millions of gallons of untreated wastewater were discharged to the Red River on a daily basis, then it would have been immediately detectable as a result of fish kills and dead vegetation and that the act would not have gone unnoticed for a long period of time.[5] This, the defense claims, would contradict the government witnesses' testimonies that millions of gallons of wastewater per day were discharged into the Red River.

After reviewing the record, the court continues to find, pursuant to Federal Rule of Evidence 403, that the probative value of the evidence regarding environmental harm is substantially outweighed by danger of unfair prejudice, misleading the

---

[4] See Chevron, U.S.A., Inc., v. Yost, 919 F.2d 27, 30 (5th Cir. 1990).

[5] The defense alleges that Tubbs's testimony is based upon his experience with the Coast Guard. His testimony shows that he worked for about five years as a pollution investigator and spill response officer.

5

jury, and jury confusion. Independently of Rule 403, the court also finds that Tubbs's proffered testimony was speculative and lacked foundation.

Furthermore, this type of testimony would need to be qualified as expert testimony under Federal Rules of Evidence 702 and 703. Up until the moment of his proffer, the defense did not identify Tubbs as an expert whose testimony would be used at trial, and because the defense did not comply with Federal Rule of Criminal Procedure 16(b)(1)(C), the court had the discretion to disallow such testimony if the defense had attempted to use Tubbs as an expert witness. See United States v. Lundy, 2012 WL 1021795, *4-6 (5th Cir. 2012).

C. **Improper Comments At Closing Argument**.

The defense claims that the government made improper comments during closing argument by introducing facts that were not in the record. In the government's rebuttal during closing arguments, counsel stated that Canadian Crude Separators Inc. ("CCS") dismantled the Arkla facility because it did not work.[6] The defense asserts that the reason why CCS dismantled the facility was not introduced at trial; and, therefore, the government's comments to that effect amounted to prosecutorial misconduct. The defense concludes that this prejudiced the defendant and, as a result, a new trial is warranted.

---

[6] In September of 2006, John Tuma sold the Arkla facility to CCS.

The purpose of closing argument is to "assist the jury in analyzing, evaluating and applying the evidence" United States v. Thompson, 482 F.3d 781, 785 (5th Cir. 2007) (quoting United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978)). It does not allow the attorney to "testify" as an "expert." See id. "Nevertheless, 'the assistance permitted includes counsel's right to state his contention as to the conclusions that the jury should draw from the evidence.'" Thompson, 482 F.3d at 785-86. Counsel can make statements that indicate his or her opinion of the case, if he or she makes it clear that those conclusions are to be inferred from the evidence introduced at trial. See id. at 786.

The court does not find that the government's comments amounted to improper conduct. Among the defense's evidentiary documents was a view of the plant site with clearly dismantled stainless steel tanks lying on the ground. See Defendant's Ex. 204-003. Additionally, some witnesses testified that the facility did not work and that CCS eventually dismantled the facility. The comments did nothing more than inform the jury of a reasonable inference based upon the evidence presented at trial.

Even if the comments were improper, they were not sufficiently prejudicial to cast serious doubt on the correctness of the jury's verdict nor did they affect the substantial rights of the defendant. See United States v. Mares, 402 F.3d 511, 516 (5th Cir. 2005). The court instructed the jury that the attorneys' comments during

closing arguments were not evidence. Additionally, the government presented substantial evidence of John Tuma's guilt.

### III. CONCLUSION

In this trial, there was no miscarriage of justice, nor was there any evidence that preponderates heavily against the jury verdict. During a period of eight days, the jury heard the testimony of Cody Tuma, Wayne Mallet, Todd Cage, John Tuma, City of Shreveport employees, an agent of the Environmental Protection Agency, employees of contractors who performed work at the Arkla facility, Analab employees, and several other witnesses. The jury deliberated for approximately four hours and fifteen minutes before reaching its verdict. Both parties were able to present evidence at trial so the jury could adequately decide the case before it.

The issues of which John Tuma complains did not deny him a fair trial. This trial presented the jurors with two entirely different scenarios. Credibility of witnesses was quite critical. It was apparent that the jurors believed the series of government witnesses and disbelieved those of the defendant, including John Tuma.

For the foregoing reasons, John Tuma's motion for new trial is **DENIED**.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this the 1st day of June, 2012.

JUDGE TOM STAGG